Per Curiam :
This case comes before the court on requests for review, under Rules 166(e) and 54(b) (3), of a recommended decision filed May 30, 1972, by Trial Commissioner Mastín G. White pursuant to Rule 166(c) wherein he denied plaintiff’s motion for summary judgment and allowed defendant’s cross motion.
Since the court is in agreement with the opinion and recommendation of the Commissioner, with a modification thereof by the court, it hereby adopts the same, as modified, as the basis for its judgment in this case as hereinafter set •forth. Therefore, plaintiff is not entitled to recover and the petition is dismissed.
Commissioner White’s opinion, with a modification by the court, is as follows:
In this case, the court is called upon to review, under the standards prescribed in the Wunderlich Act (41 U.S.C. §§ 321,322), a decision by the Armed Services Board of Contract Appeals dated September 30,1968 (ASBCA Nos. 12814 and 12890). The Board held that an item of $882.04 was not properly chargeable by the plaintiff against a cost-reimbursement contract, No. AF 33 (600)-40599, between the plaintiff and the Department of the Air Force, and that an item of $17,355.11 was not properly chargeable against a similar contract, No. AF 04(695) -514.
The items of $882.04 :and $17,355.11 represented portions *351 of the total expense ($2,843,256) incurred by the plaintiff during 1964 and 1965 in fabricating and demonstrating an aircraft known as the Charger. The plaintiff’s costs in connection with the manufacture and demonstration of the Charger were initially charged on the plaintiff’s books to an overhead account that covered selling costs. From such overhead account, the plaintiff then allocated the Charger costs on a proportionate basis to approximately 160 cost-reimbursement contracts ('including Nos. AF 33(600)^40599 and AF 04(695)-514 which the plaintiff was performing for agencies at the Defense Department.
Thus, the outcome of the present case will affect claims totaling $2,843,256 under approximately 160 contracts.
The Charger was an outgrowth of the plaintiff’s interest in developing a type of light-armed reconnaissance aircraft which would be suitable for use in counter-insurgency operations. (This type of aircraft is usually referred to in the record, and will sometimes be referred to hereafter in the opinion, as “LARA/COIN.”) Since such an aircraft was thought of as being used in counter-insurgency operations under primitive conditions, it would be necessary that the aircraft be capable of operating from short, unimproved airstrips. This objective was known as the STOL (short take-off and landing) concept. The plaintiff has begun working on the concepts involved in a LARA/COIN, particularly the STOL concept, in June of 1962. The plaintiff’s research efforts in this field continued through the remainder of 1962 and 1963, and into 1964.
In August of 1962, following discussions of the subject in military and industrial circles, the Marine Corps Development Center wrote a specific operational requirement for a LARA/COIN. A year later, in August of 1963, the Advanced Research Project Agency of the Defense Department developed a LARA/COIN specification, which included performance characteristics for the aircraft desired. Then on October 28, 1963, the Department of Commerce Business Daily carried an announcement of a forthcoming competitive procurement by the Government of a LARA/COIN.
The plaintiff decided in 1963 to pursue the LARA/COIN *352 program more actively, as the potential business was estimated by the plaintiff to involve approximately 1,000 aircraft, representing total sales of from $200,000,000 to $300,000,000. By March of 1963, the plaintiff had developed various configurations of such a potential aircraft. As of September 1963, the plaintiff’s activities in this field were centered on bid and proposal efforts, pre-design work on the STOL concept, independent research and development, some wind tunnel work, and customer sales activities.
On December 5,1963, the Department of the Navy issued a request for proposals (“RFP”) on a LARA/COIN project. Engineering proposals were to be submitted by March 9,1964, and price proposals were to be submitted by March 23,1964. The NAYY RFP stated in part as follows:
Upon approval and funding of this program by the Secretary of Defense, anticipated in first quarter of FY 1965, it is planned to award a contract to the responsible bidder [sic] whose proposal is judged to be most advantageous to the Government. The objective of this program is the development of a versatile airplane of minimum size, complexity and price which from the outset is designed for operations by field forces in a primitive environment with a minimum of logistic support. In the evaluation of proposals significant weight will be given to performance which exceeds the requirements of the Type Specification (TS-158) in addition to design, timing and price. The ultimate performance goal for this airplane is the accomplishment of the Armed Reconnaissance Mission with takeoff and landing distances of 500 feet over a 50 foot obstacle.
TS-158, which was referred to in the Navy RFP, covered “the essential requirements for the design and construction” of the LARA/OOIN. In a paragraph entitled “GUARANTEED TABULATED PERFORMANCE,” it was stated (among other things) that the “Takeoff [and landing] distance over a 50 foot obstacle at sea level” must be “less than 800 ft.” However, the specification further stated that it was desired that the prescribed performance characteristics be bettered, if possible.
The Navy RFP stated that the initial contract to be *353 awarded would be on a fixed-price basis for four prototype aircraft, and would include options under which, the Government could purchase (1) up to three additional prototype aircraft and (2) a total of 500 production models over a 3-year period beginning 2 calendar years after the date of the initial contract award.
In March of 1964, the plaintiff and six other firms submitted engineering and price proposals to the Navy in response to the RFP of December 5,1963.
The plaintiff’s technical approach to the STOL concept was distinct and consisted of three basic characteristics: a fully movable horizontal tail; slipstream wind flaps that would be deflectable to a full 90 degrees in order to generate the required lift; and a landing gear with a very high sink rate, which would enable the aircraft to “fly into the ground and then stop quickly.”
Before March 1964, nothing close to these technical concepts had ever been demonstrated in an aircraft. The closest comparable aircraft was a NASA research vehicle known as the VZ-3, which had incorporated short take-off and landing techniques a few years prior to 1964. Problems had been encountered with the NASA test vehicle, and they created doubt among NASA, Navy, Air Force, and Army technical personnel as to whether the plaintiff’s concepts could achieve the proposed STOL performance and flying qualities.
The plaintiff concluded that proof of the soundness of its STOL concepts was crucial to the LARA/COIN program. Accordingly, at about the time in 1964 when the plaintiff submitted its engineering proposal to the Navy in response to the RFP of December 5,1963, the plaintiff’s management decided to fabricate an aircraft that would be used to demonstrate the STOL characteristics required by the RFP. One aspect of this decision that is of interest with respect to the present litigation was to the effect that the costs incurred in connection with the fabrication of the demonstration vehicle be charged to an overhead account that covered selling costs.
The manufacture of the demonstration aircraft was promptly undertaken by the plaintiff in great secrecy, as the plaintiff believed that it would obtain a competitive advan *354 tage if its competitors in the aircraft industry were unaware of this particular project. The secret was not only preserved insofar as the plaintiff’s competitors were concerned, but the Government, which had representatives in the plaintiff’s plant, was completely unaware of this particular project until September 1964.
While the plaintiff was engaged in the secret manufacture of the demonstration aircraft, the Navy on August 15, 1964 accepted the engineering and price proposals that had been submitted by a competitor of the plaintiff, North American Rockwell, in response to the RFP of December 5, 1963. A contract was awarded by the Navy to North American Rockwell on the date mentioned.
Notwithstanding the loss to North American Rockwell of the Navy contract under the RFP of December 5, 1963, the plaintiff continued its secret manufacture of the aircraft to demonstrate the soundness of its STOL concepts.
On September 14, 1964, the plaintiff submitted to the Department of the Army an unsolicited proposal for a light-armed reconnaissance aircraft with STOL capabilities. The plaintiff advised the Army it was fabricating a prototype of an aircraft “to fulfill the armed reconnaissance and surveillance role”; that this aircraft “is the only one now in existence that was designed specifically for operation in unprepared, rough terrain, in support of forward area ground forces and can be made available in production quantities at least a year in advance of any other aircraft of similar characteristics”; and that flight tests would be conducted to provide an opportunity for the evaluation of the aircraft’s STOL performance capabilities and other characteristics. The record does not disclose what response, if any, was made by the Army to this proposal.
The plaintiff’s work on the demonstration aircraft — which was called the Charger — was completed and the vehicle was “rolled out” on September 29, 1964.
The plaintiff conducted several demonstration flights of the Charger for Government personnel, and it invited the Army, Navy, Air Force, and Marine Corps to have their pilots test-fly the Charger in order to demonstrate to these *355 agencies — all of which, were engaged in the procurement of military aircraft — that the plaintiff had achieved the concepts which it had been advocating in connection with the LABA/COIN program.
In 1965, the National Aeronautics and Space Administration (“NASA”) had a planned research program pertaining to commercial transportation in the STOL field. After some preliminary negotiations, the plaintiff and NASA entered into a flight-test contract dated June 29, 1965, under which the plaintiff made the Charger available to NASA flight-test personnel for 10 hours of flight testing. The plaintiff supported the airplane during such flight-testing and reduced the data resulting from the flight-tests. The plaintiff was paid $35,332 under the contract.
A report was prepared by a NASA research center with respect to the flight-testing of the Charger that was performed under the contract of June 29, 1965. This report stated in part as follows:
A continuing need exists for the development of a small, uncomplicated aircraft with good high-lift capability to allow operation from short, unimproved fields. Proposed uses are for transportation, in the so-called under-developed countries, and also as a counterinsurgency (or COIN) aircraft. Many previous papers and reports have pointed out the large maximum lift capabilities of propeller driven STOL airplanes. However, operational utilization of these lift capabilities has been limited by inadequate descent performance, poor handling qualities, and concern over the loss of an engine. To examine these problem areas further and to obtain additional operational experience with STOL aircraft (as well as for evaluation as a possible NASA STOL research aircraft), 10 'hours of flight testing were performed in the first flying prototype COIN, the Convair Model 48 “Charger.”
*****
This paper shows that a current generation COIN aircraft is capable of good low-speed performance and handling qualities when flown in the STOL regime, provided the possibility of engine failure is ignored or a suitable safeguard, such as cross shafting, is incorporated. This performance is achieved in spite of the flaps *356 having only medium effectiveness because the aircraft has a low aspect ratio, a high power loading, and a landing gear designed for no-flare landings. However, when it is flown above the minimum single engine control speed, in compliance with the safety restrictions for twin-engine airplanes, major aspects of the performance are no better than that obtainable with many small twins in current production, and most of the original objectives of the COIN concept are compromised.
In discussing the handling qualities of the Charger, the NASA report indicated “that they were acceptable for a test-bed airplane.” With respect to the Charger’s STOL performance, the report stated (among other things) that “During the Convair flight testing, actual landing distances as low as 600 feet over a 50-foot obstacle were achieved,” and that “the take-off distances over 50 feet, minimum as well as average, were approximately 100 feet less than those for landing.”
In September 1965, the plaintiff and the Navy entered into an agreement which authorized the Navy to use the Charger for 40 hours of flight-testing. The plaintiff’s functions under the agreement were to instrument the aircraft and to reduce the data resulting from the flight tests. The plaintiff was to be reimbursed in the amount of $38,000 for its costs incurred in connection with the instrumentation and the reduction of flight test data.
On October 19, 1965, while a Navy pilot was flying the Charger under the agreement of September 1965, the port engine of the aircraft failed to restart during a shutdown and restart test. The pilot attempted to make a single-engine landing, but he was unable to control the aircraft and ejected. The Charger crashed and was a total loss. Subsequently, the plaintiff collected $632,018 as the proceeds of an insurance policy on the Charger.[1]
As previously indicated, the costs which the plaintiff incurred during 1964 and 1965 in connection with the fabrication and demonstration of the Charger were charged on the plaintiff’s books to an overhead account that covered selling costs, and such costs were thereafter allocated by the plain *357 tiff on a proportionate basis to approximately 160 cost-reimbursement contracts which, the plaintiff was performing for agencies of the Defense Department. The following is a breakdown of the costs that are involved in this controversy:
Engineering_ $615,647
Tooling (soft)_ 63, 507
Production_ 695,389
Materials _ 620,200
Design Data (Mise. Test)- 99,133
Static & Fatigue Test_ 26, 672
Flight Test Demonstration- 1,168, 933
Other_ 105,214
$3, 394, 695
Less
Insurance Indemnification proceeds following destruction of the “Charger”--- 632,018
Carry-over to 1966 costs- 14,342
Total costs claimed-$2, 843,256
The Armed Services Board of Contract Appeals held that the costs outlined in the preceding paragraph were development costs, rather than selling costs as shown on the plaintiff’s books and as contended by the plaintiff before the Board. The plaintiff had agreements with the Defense Department for 1964 and 1965 covering the performance, on a cost-reimbursement basis, of research and development projects, but the Charger project, having been undertaken by the plaintiff in secret, was not included, of course, among the research and development projects that were expressly covered by the 1964 and 1965 agreements between the parties. Furthermore, the 1964 and 1965 research and development agreements had reimbursement ceilings that would have been exceeded if the plaintiff had sought reimbursement under such agreements for the costs incurred in fabricating and demonstrating the Charger.
The Board relied on subparagraph (b) of paragraph 15-205.35 of the Armed Services Procurement Begulations. At the time with which we are concerned in the present case, ASPE paragraph 15-205.35 dealt with the subject of “Ke- *358 search, and Development Costs,” and subparagraph (b) defined “development” in the following language:
(b) Development is the systematic use of scientific knowledge which is directed toward the production of, or improvements in, useful products to meet specific performance requirements, but exclusive of manufacturing and production engineering.
The Board reviewed the evidence concerning the Charger, and then concluded that the plaintiff “embarked upon the systematic use of the scientific knowledge it acquired in its admittedly research program, both to improve and later produce a useful product, i.e., a production aircraft,” and “that the design, building and flight-testing of Charger constituted development work within the provisions of the contract and the contractually-incorporated cost principles.” The Board further held that since “any reimbursement for the Charger work would be in excess of the reimbursement ceiling set in the IKAD [independent research and development] agreements for 1964 and 1965 * * * disallowance of the Charger costs is appropriate * * *.”
The plaintiff has contended that the Charger costs were allowable as bidding costs. In this connection, ASPE, paragraph 15-205.3, entitled “Bidding Costs,” provided in part as follows:
(OWAS) Bidding costs are the cost of preparing bids or proposals on potential Government and non-Government contracts or projects, including the development of engineering data and cost data necessary to support the contractor’s bids or proposals. Bidding costs of the current accounting period of both successful and unsuccessful bids and proposals normally will be treated as allowable indirect costs * * *.
It seems obvious that when the plaintiff was fabricating and demonstrating the Charger, such activities were entirely different from those involved in “preparing bids or proposals on potential * * * contracts or projects.” Consequently, the Charger costs could not reasonably be regarded as bidding costs.
With respect to the plaintiff’s contention that the costs *359 involved in fabricating and demonstrating the Charger constituted selling costs, it is pertinent to note the following language in subparagraph (a) of ASPE paragraph 15-205.37:
¡(a)' 'Selling costs arise in the marketing of the contractor’s products and include costs of sales promotions, negotiation, liaison between Government representatives and contractor’s personnel, and other related activities.
Certainly, the costs incurred by the plaintiff in secretly fabricating the Charger could not reasonably be regarded as having arisen “in the marketing” of the plaintiff’s products.
In its opinion, the Armed Services Board of Contract Appeals stated:
Two of Convair’s witnesses offered the theory that categorizing an activity as falling within IRAD, bid and proposal or selling costs depends upon the subjective intent of those doing the work. (Tr. pp. 101, 154). Measuring this subjective intent against Convair’s definitions of research and development work for costing purposes (which are identical with ASPR) (See General Dynamics Corporation Executive Order No. GD-51, issued January 9, 1963. Gov’t Ex. G-13; ASPR 15-205.35(a) and (b)), these witnesses concluded (1) the work concerned was neither research nor development; (2) the costs incurred could be categorized interchangeably as either selling expense (demonstrations) or bid and proposal costs; and (3) selling expense (demonstrations) is the ultra-correct category.
_ We do not agree that Convair’s subjective intent, particularly unless clearly manifested, should govern our decision. In our opinion, we must look to the contractual definitions, examine both the overt acts of the parties as well as expressed intent, and then determine from all of these how the work concerned and the costs incurred should be categorized.
We agree with this statement of opinion.
Notwithstanding the award of the Navy contract on August 15,1964 to North American Rockwell under the RFP of December 5, 1963, plaintiff continued the secret and unsolicited manufacture of its aircraft to demonstrate the soundness of its STOL concepts, and almost a year after the *360 award of the Navy contract to North American, completed its demonstration aircraft, the Charger. It then conducted several demonstration flights of the Charger for Government personnel and invited the military forces to have their pilots flight-test the aircraft.
Plaintiff’s flight-test contract of the Charger with the National Aeronautics and Space Administration dated June 29,1965 was performed, and plaintiff was paid $35,332 in full under the contract. Plaintiff’s next demonstration was under an agreement which authorized the Navy to use the “Charger” for 40 hours of flight-testing, for an agreed reimbursement of $38,000 to cover plaintiff’s costs for the instrumentation and reduction of flight-test data. There is no record of any further claim by plaintiff at that time for demonstration costs, although plaintiff was obviously trying to. sell the Charger to the Navy. Plaintiff was paid the $38,000 item by the Navy for the costs associated with the reduction of the flight-test data. To the extent that the reports and data benefitted the United States, these benefits were paid for by the Government under the flight-test contracts. There is nothing in the record before us to establish that at the time these two flight-test contracts were negotiated, plaintiff had made any claim for other flight-test demonstration costs as a part of its “selling costs.”
ASPE 15-205.37 does not define “selling costs” but states that they “arise in the marketing” of products, and we agree with the Board’s conclusion that:
* * * We take the quoted expression to confine this category of costs to those directly attributable to marketing efforts. The examples used in ASPE confirm this conclusion, even though they themselves are extremely broad and lend themselves to high-flying when used out of context. The specific examples are “sales promotions, negotiation, liaison between Government representatives and. contractor’s personnel.” The example “sales promotions’’ must be read together with ASPE 15-205.1 (Advertising Costs), which reflects a statutory pro-hibitionagamst reimbursement for the expense of almost every kind of sales promotion activity. (P.L. 87-144, Aug. 17, 1961). Inclusion in the non-reimbursable category.of “exhibits, free goods, and samples, and the Wee” (italics supplied), would seem to bar reimbursability of *361 demonstration when used as a vehicle for advertising, as opposed to technical demonstrations for personnel specifically designated by the Government to make technical evaluations. Neither the Department of Defense alone, nor the parties by agreement, would seem to have the authority to nullify a statute, even by publication of an ambiguous regulation or writing an ambiguous contract clause. We should have to hold that the intent of such a regulation or clause would be to comply with the law. Neither of the other two examples bears any relationship to such an activity as constructing a test-bed airplane.
Considering Charger as the “media” for a sales promotion effort, the cost of its fabrication, in our opinion, would be clearly nonreimbursable under ASPE 15-205.1, regardless of the content of ASPE 15-205.37.
The word “demonstration” appears in ASPE 15-205.37 only in the context of giving it status as a factor to be used in measuring allocability of otherwise allowable selling costs. Appellant appears to contend that the mere use of the word in this connection automatically elevates demonstrations to the status of reimbursability. We cannot agree that this transmutation results.
There do not appear to be any cases strictly defining the difference between independent research and development costs (IEAD) and selling costs. We note that the ASPE regarding selling costs refers to the costs associated with the selling of a product. The Board correctly found that the Charger was not a “product” within the meaning of ASPE 15-205.37; that it was an experimental aircraft, built to demonstrate its general STOL capabilities.
There is nothing in the record to indicate that plaintiff-appellant presented evidence that established accounting principles permit categories of costs associated with fabrication, development and demonstration of an experimental aircraft as “selling costs” chargeable as an overhead item against other business with the Government, as here claimed by plaintiff.
ASPE 15-107 referred to in 15-205.37 (b) warns a prospective contractor that the- allowability of certain items of cost are subject to dispute and possible disallowance, and points out that:
* * * In order to avoid possible subsequent disallowance or dispute based on unreasonableness or nonallocability, *362 it is important that prospective contractors, particularly those whose work is predominantly or substantially with the Government, seek agreement with the Government in advance of the incurrence of special or unusual costs in categories where reasonableness or allocability are difficult to determine. * * *
Included among the eight items of cost cited in this ASPE, as “difficult to determine” are: “research and development costs” and “selling and distribution costs.” Despite this clear warning, plaintiff embarked upon the Charger project without any effort to “seek agreement with the Government in advance of the incurrence of special or unusual costs in categories where reasonableness or allocability are difficult to determine.” On August 15, 1964, plaintiff knew that the Government had awarded the “LAKA/COIN” prototype development contract to North American. Nevertheless, plaintiff continued with secret and independent research and development to develop an aircraft to meet the requirements of the Government’s Eequest for Proposals, and incurred the costs of independent research and development which it now seeks to allocate to other contracts as “costs of selling” its “product.”
ASPE 15-205.37 (b) defines the allowability of selling costs. They must be reasonable and allocable to Government business. Allocability depends upon “reasonable benefit to the Government * * * from * * * activities * * * which are for purposes such as application or adaptation of the contractors’ 'products to Government use.” [Emphasis supplied.] However, this criterion of “reasonable benefit to the Government” is not the only factor to be considered in determining what can be allowed as “selling costs.”
Plaintiff correctly argues that “products” must be demonstrated before the Government will consider procurement of the product. However, prior to this “product” demonstration, the required procedure of the Government with experimental aircraft was to issue Bequests for Proposals and then let a prototype contract to develop demonstrable prototype aircraft on a fixed-price basis. If the prototype then meets Government requirements, a production contract for quantity production of the product is then completed. This estab- *363 lisbed procedure was followed by the Government in awarding the prototype control to North American, as here-inbefore set out in detail.
Plaintiff cites Bell Aircraft Corp. v. United States, 120 Ct. Cl. 398, 100 F. Supp. 661 (1951), aff'd per curiam, 344 U.S. 860 (1952), for the proposition that where a contractor’s efforts might overlap or could be useful to one or more cost objectives, such costs may be allocable as either one or both as contractor wishes to account for them, and that this court and the Board have consistently recognized contractors’ cost judgments in determining cost allocability questions.
In Bell Aircraft, four cost-plus, fixed-fee contracts for the production of P-39 Airacobra airplanes were entered into during World War II by Bell and the United States. Several years 'prior to these contracts experimental and development costs had been incurred by plaintiff in the performance of certain other fixed price experimental contracts. The costs of developing the original design were capitalized by plaintiff as deferred charges for later distribution as an element of cost against production. This court held that the costs were compensable under the four cost-plus, fixed-fee contracts. It found that plaintiff’s deferred experimental, development and production tooling costs were a valid part of the production costs under both the fixed price and the cost plus contracts.
The key to the court’s holding in Bell Aircraft was a finding that the costs involved in developing the experimental Airacobras constituted research and development chargeable against production contracts actually obtained. In the instant case, plaintiff is strenuously contending that similar costs were not research and development but “selling costs.” No prototype or production contracts were ever obtained by plaintiff corporation.
Bell Aircraft is not authority for plaintiff’s proposition that independent and secret research and development costs of an experimental aircraft incurred without any contract, express or implied, are “selling expenses” to be allocated to the Government.
Upon review of the record before us, we concur with and *364 affirm the decision herein of the Armed Services Board of Contract Appeals.
On September 20, 1972 the court ordered that argument on the issues raised in a motion for stay be included in the briefs submitted on review of the Commissioner’s opinion. The motion for stay was alleged upon the ground of newly discovered evidence, i.e., the Rand Report entitled “A Prototype Strategy for Aircraft Development.” The Rand Report is a Memorandum dated July 1972, of Rand’s continuing work for the Government on research and development policy for the Air Force, including extensive discussion as to when or whether prototypes should be built, and what sort of management and cost structure is appropriate to prototype programs. Included in its exhaustive 45-page discussion is a ten-page analysis of the procurement difficulties encountered in the OY-lOA aircraft development by North American under its R & D contract to which we have alluded, and the Charger aircraft development by plaintiff, including a later Charger II program which is not under consideration in the present case before us. The report encompasses the relative cost and capability of these two types of aircraft, and observes that disregarding differences of cost for the moment between the two approaches, “it seems evident that building and flight-testing of what were inherently in both cases, prototype aircraft, paid substantial dividends.” 'It also observes that “Convair’s [plaintiff’s] prototype provided the information needed to x'esolve unknowns of design and performance at lesser costs and sooner than did the sponsored type” and that Convair conducted its engineering, fabrication and preliminary test of the Charger much more cheaply than North American.
However, the report also observes that:
Procedures of the sort employed in the “Charger” project ran counter to nearly all of the rules of the road adopted since the appearance of the weapon system concept in the early 1950s. And, of course, they were incompatible with the management manuals on which the Air Force relied in the 1960s. * * *
*365 However, we do not rely upon or consider the Eand Eeport or Memorandum in our resolution of the issues before us. We conclude that plaintiff’s claim for costs are for independent research and development and not “selling costs”; the Eand Eeport is irrelevant in reaching this conclusion. Accordingly, plaintiff’s amended motion to stay, received here on August 29,1972 is denied.
We conclude that plaintiff has f ailed to establish that the decision of the Armed Services Board of Contract Appeals in this case is in any way arbitrary, capricious, lacking in proper substantial evidentiary support, or legally erroneous. Accordingly, plaintiff’s motion for summary judgment is denied, defendant’s cross motion for summary judgment is granted, and the petition dismissed.

 The plaintiff was paid $27,586 under the Navy flight-test contract.